UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED ENERGY TRADING, LLC,

    Plaintiff,

    v.

PACIFIC GAS & ELECTRIC CO., et al.,

    Defendants.

Case No. 15-cv-02383-RS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

## I. INTRODUCTION

This dispute centers on allegations that defendant Pacific Gas & Electric Company ("PG&E") engages in fraudulent activity as the billing and collections agent for plaintiff United Energy Trading, LLC ("UET"). Following an earlier ruling in which PG&E knocked out a quartet of putative claims, UET amended its complaint to reassert three theories of liability: (1) a RICO-based *respondeat superior* claim; (2) a Sherman Act "attempt to monopolize" claim, 15 U.S.C. § 2, and (3) a claim for conversion under California state law. PG&E now moves to dismiss these claims with prejudice for a second time. For the reasons set forth below, the motion to dismiss is denied as to the *respondeat superior* claim, and granted with leave to amend as to the Sherman Act and conversion claims. Pursuant to Civil Local Rule 7-1(b), the motion set for April 21, 2016, is suitable for disposition without oral argument, and the hearing will be vacated.

## II. FACTUAL BACKGROUND[1]

PG&E and UET compete to provide natural gas to residential and small commercial end-

---

[1] The factual background is based on the averments in the amended complaint, which must be taken as true for purposes of a motion to dismiss. The background was set forth in greater detail in the prior order and is repeated here only as it pertains to UET's new allegations.

1  users in California.  The gas both supply is completely fungible in composition and function.  If
2  UET cancels a customer, they revert to PG&E as the default natural gas provider.
3       UET is a Core Transportation Agent ("CTA"), meaning it buys gas on the open market and
4  sells it to customers using PG&E's distribution system.  Proposed CTAs must fulfill exacting
5  standards to operate in California, among them, completing an application, submitting executives'
6  fingerprints, establishing creditworthiness, and posting a bond.
7       PG&E is required to offer CTAs the opportunity to consolidate their bills with those of
8  PG&E.  Under a program called "Optional Consolidated PG&E Billing," both the CTA's charges
9  and PG&E's charges appear on a consolidated statement, and the customer pays both sets of
10 charges with a single check to PG&E.  Under Consolidated Billing, PG&E also acts as the CTA's
11 collections agent.  In that capacity, PG&E sends notices to the CTA's customers informing them
12 of unpaid balances, collects from the CTA's customers the balance of unpaid charges, and takes
13 other actions to help recover from customers any unpaid amounts owed to the CTA.  After PG&E
14 receives money from a customer, it is required to pay the CTA the amounts paid to PG&E for the
15 CTA's charges.  In 2012, UET elected to participate in the Optional Consolidated PG&E Billing
16 program.
17      The instant dispute centers on allegations that PG&E engages in unlawful activity as
18 UET's billing and collections agent.  Specifically, UET avers three separate schemes in which
19 three individual PG&E employees defraud UET and its customers.  In the "Payment Withholding
20 Scheme," UET avers PG&E receives payments from UET customers and "holds" that money in a
21 PG&E account instead of paying it to UET.  In the "Energy Credit Scheme," PG&E applies
22 credits from its own services and programs to UET's charges, effectively misappropriating them to
23 offset the money PG&E owes to its own customers.  In the "Reversal Scheme," PG&E
24 inappropriately "reverses" UET customer charges.  A reversal is a signal to UET that PG&E
25 cannot collect on UET's unpaid balance.  PG&E apparently reverses UET accounts from which
26 payment affirmatively has been received.
27      UET submits the individual defendants—Albert Torres (PG&E's Vice President of
28

Customer Operations), William Chen (PG&E's ESP Service Manager), and Tanisha Robinson (PG&E's Supervisor for EDI Operations and ESP Billing)—committed the racketeering while working in PG&E's offices and using PG&E's systems. UET believes these defendants commit racketeering in part to benefit PG&E, and argues the activities are of a kind the defendants were hired to perform for PG&E legitimately.

UET insists the schemes diminish competition within the gas commodity market. For instance, between 2012 and 2014—prior to implementation of the schemes—the firm pipeline capacity (or "load") for all CTAs grew from approximately 12 percent to 19 percent. Since implementation of the alleged schemes, however, the load steadily has decreased to 15.4 percent.

UET also maintains the schemes have increased consumer prices despite an ample supply of natural gas and decreasing wholesale prices. Between 2014 and the present, for instance, the monthly California price of natural gas delivered to residential consumers has increased from $10 to $12 per thousand cubic feet. During that same period, the Citygate price for natural gas in California has decreased from roughly $6.00 to $3.00 per thousand cubic feet. By UET's calculation, since the schemes were implemented, consumers are paying 20 percent more for natural gas even though the Citygate price of the commodity is 50 percent less than it was in 2014.

UET contends PG&E—the corporation—does not acknowledge any of the schemes, and has done little or nothing to curtail the unlawful acts of its employees, even though some speak openly about the schemes. This is unsurprising, says UET, because PG&E profits from the three schemes by: (1) charging UET transportation and storage fees; (2) increasing the bad debt of its competitors; (3) reducing its own liability for mandatory credits; and (4) gaining the ability to charge consumers higher prices.

On August 31, 2015, PG&E moved to dismiss the complaint on various jurisdictional grounds and for failure adequately to plead claims for relief. The motion was granted as to the breach of contract claim, and granted with leave to amend as to the *respondeat superior*, Sherman Act, and conversion claims. Dkt. No. 74. UET filed the First Amended Complaint ("FAC") on December 18, 2015, and PG&E moved to dismiss the FAC about six weeks later.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard asks for "more than a sheer possibility that a defendant acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id*. at 679.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy the rule, a plaintiff must allege the "who, what, where, when, and how" of the charged misconduct. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). In other words, "the circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim."

*Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Twombly*, 550 U.S. at 555 ("threadbare recitals of the elements of the claim for relief, supported by mere conclusory statements," are not taken as true).

## IV. DISCUSSION

The motion to dismiss takes aim at three claims: (1) UET's RICO-based *respondeat superior* claim; (2) the Sherman Act "attempt to monopolize" claim, 15 U.S.C. § 2, and (3) the state law claim for conversion. UET's amended pleading states adequately a claim showing PG&E's *respondeat superior* liability for an alleged violation of 18 U.S.C. § 1962(c); it does not allege satisfactorily either of the two remaining claims.

### A. Respondeat Superior

UET seeks to hold PG&E vicariously liable for the racketeering activities allegedly committed by the individual defendants. The "second cause of action" is somewhat confusingly styled "Respondeat Superior/Agency,"[2] and does not identify whether the claim giving rise to vicarious liability arises under 18 U.S.C. § 1962(c) or (d). Dkt. No. 76 at 22. The allegations, however, are pitched only at showing PG&E's *respondeat superior* liability for an alleged violation of section 1962(c). As such, only that particular theory of vicarious liability need be addressed.

An employer may be liable for an employee's violation of section 1962(c) under the doctrine of *respondeat superior* where: (1) "the employer is distinct from the enterprise," *Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992); (2) the employer "benefitted from

---

[2] The doctrine of respondeat superior provides "[a]n employer is subject to liability for torts committed by employees while acting within the scope of their employment." Restatement (Third) of Agency § 2.04 (2006). Agency—also invoked by the claim—"is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01. To establish an agency relationship "(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking." *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, 1239 (N.D. Cal. 2004). UET does not appear to press any longer for the existence of an agency relationship.

its employee's RICO violation," *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002); and (3) the employee's acts were committed "within the course and scope of her employment," meaning "the conduct occurred substantially within the time and space limits authorized by the employment," "the employee was motivated, at least in part, by a purpose to serve the employer," and "the act was of a kind that the employee was hired to perform." *Id.* at 775–76.

Taking these elements in turn, the prior order found the distinctness requirement is met. *See* Dkt. No. 74. UET also pleads adequately that PG&E benefits from the putative RICO violations. Specifically, the "Payment Withholding Scheme" allegedly yields PG&E UET's charges, and the "Energy Credit Scheme" allegedly reduces PG&E's monetary liability to its customers. Further, UET customers likely revert to PG&E as a consequence of the "Reversal Scheme," and the schemes taken together allegedly permit PG&E to charge consumers higher prices.

Continuing, UET pleads satisfactorily that the individual defendants' acts occurred "substantially within the time and space limits authorized by the employment." In particular, Robinson, Torres, and Chen allegedly proceeded with the three schemes "while they were working in PG&E's offices" and using "PG&E's systems." Compl. ¶ 115. This follows from the allegation that defendants transmitted false information routinely in EDI files, *see, e.g.*, Compl. ¶ 67, and directed their departments to implement the various fraudulent schemes, *see, e.g.*, Compl. ¶¶ 95–97.

As to the individual defendants' motivation, UET avers "[o]n information and belief, the Individual Defendants were motivated to commit the racketeering activities for the purpose of benefiting PG&E financially through increased profit and market share, and thereby benefitting themselves as the employees responsible." Compl. ¶ 115. Though this allegation is unadorned, it nevertheless is a plausible interpretation of the individual defendants' motivation, as the financial benefits do not flow to the individual employees, but to PG&E. Accordingly, taken in context, UET has pleaded adequately the individual defendants were motivated—"at least in part"—by a

purpose to serve PG&E.

UET's final task is to plead the acts were of a kind the individual defendants were hired to perform. On that front, UET contends the individual defendants committed the predicate acts under the auspices of their usual job responsibilities. Torres, for instance, formally oversees the employees in Customer Operations, but allegedly directs them to withhold UET payments in furtherance of the "Payment Withholding Scheme." Robinson and Chen direct the employees in ESP and EDI Operations, and allegedly leverage those positions to send EDI files containing false information. UET insists that none of the individual defendants would be able to perpetuate the fraudulent schemes without the authority vested in them formally through their positions at PG&E.

PG&E shoots back the fraudulent activity alleged is not part of the individual defendants' job responsibilities, and invokes *Oki* to argue UET simply cannot meet its pleading requirement. In *Oki*, a bank teller was accused of conspiring to violate RICO, and the plaintiff sought to hold the teller's employer, the bank, vicariously liable. 298 F.3d at 775. The court noted the teller "used her position at Wells Fargo to orchestrate the Conspiracy's affairs," including by "establish[ing] numerous bank accounts in the names of fictitious entities" and "transferring money from one entity to another." *Id.* at 771. The court found the individual employee did not commit the unlawful act—entering into the RICO conspiracy—within the course and scope of her employment as a teller at Wells Fargo. *Id.* at 776. "[C]onspiring to violate RICO," the court said, "was not the kind of function Wells Fargo hired [her] to perform," and "such activity was well beyond her job description as a bank teller." *Id.* at 777. Likewise, PG&E insists the individual defendants were not hired to engage in fraudulent activity, and this is all the more true given PG&E did not learn of the misconduct alleged until at least April 2015.

At bottom, UET has pleaded adequately the unlawful acts were of a kind the employees were hired to perform because, unlike in *Oki*, the defendants allegedly violate RICO by fulfilling their actual job responsibilities. The *actus reus* for conspiracy is the agreement between two or more people to commit an unlawful act. In *Oki*, the court was right that the act of agreeing to

violate RICO was not "the kind of function" the teller was hired to perform. *Id.* Here, however, Robinson, Torres, and Chen allegedly violate RICO by supervising employees and sending EDI files—acts they were hired to carry out. As UET invokes these precise acts as a basis for its *respondeat superior* claim, it satisfactorily has pleaded the final requirement. Accordingly, PG&E's motion to dismiss this claim must be denied.

**B. Sherman Act**

Section 2 of the Sherman Act outlaws anticompetitive conduct that monopolizes or threatens actual monopolization. 15 U.S.C. § 2. To make out a claim for an attempt to monopolize, UET must specify the market PG&E targeted and PG&E's economic power within that market. UET also must demonstrate: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power'; and (4) causal antitrust injury." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995).

The relevant product and geographic market UET identifies is "the deregulated retail natural gas market in [PG&E's] service area." Compl. ¶ 120. This allegation is adequate, as CTAs compete with PG&E in that arena to provide a wholly interchangeable product.

To demonstrate market power, UET must show "the defendant owns a dominant share of th[e] market," "there are significant barriers to entry," and "existing competitors lack the capacity to increase their output in the short run."[3] *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Here, UET avers PG&E's share of the market is "70-90" percent. Compl. ¶ 2. UET also notes CTAs must fulfill exacting standards to operate in California, among them, completing an application, submitting executives' fingerprints, establishing creditworthiness, and posting a bond. UET makes no showing that "existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434.

---

[3] In *Rebel Oil*, a market share of forty-four percent was sufficient to find market power, assuming "entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." 51 F.3d at 1438.

CASE NO. 15-cv-02383-RS

8

UET has not pleaded satisfactorily that PG&E possesses market power. "A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme." *Rebel Oil*, 51 F.3d at 1439. Indeed, "[t]he plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Id.* UET accuses PG&E of "increasing commodity gas prices in California," Compl. ¶ 14, but does not explain adequately whether the regulatory requirements bar rivals from entering the market,[4] or whether rivals lack capacity to challenge PG&E's prices. Nor does UET grapple with the allegations that appear plainly to undermine its claim, including the "ample supply of natural gas" available to competitors, Compl. ¶ 86, and PG&E's inability to set its own prices, Compl. ¶ 24. This is all the more puzzling given UET's admission that CTAs, unlike PG&E, "can change their prices at any time in response to fluctuations in the wholesale market." Opp'n at 21:20–21. Finally, perhaps the most glaring deficiency is that, unlike the opposition brief, the complaint does not allege "[t]he schemes are perpetrated against the entire CTA industry." Opp'n at 10:26. As such, even assuming the schemes prevent UET from offering lower rates—thereby detracting from its ability to pressure PG&E into applying for a similar rate reduction—the complaint offers no basis to question whether rival CTAs correspondingly lack the capacity to challenge PG&E's prices. In sum, UET has not pleaded adequately the necessary requirement that PG&E possesses market power.

Even if UET had met the above requirement, it still would have a long way to go. To start, UET does not allege adequately that PG&E had the specific intent to control prices or destroy competition. That three schemes may have been perpetrated against UET, and no one else, does not give rise to the requisite inference. Nor can it be inferred simply by pointing to PG&E's share

---

[4] Notably, "[t]o justify a finding that a defendant has the power to control prices, entry barriers must be significant—they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Rebel Oil*, 51 F.3d at 1439. The complaint says nothing about the entry of competitors into the natural gas market during the relevant time frame.

of the market. Next, the complaint does not allege satisfactorily anticompetitive conduct or a dangerous probability of achieving monopoly power. This conclusion follows from the absence of facts showing PG&E targeted other CTAs, or that the schemes directed at UET somehow inhibit other CTAs from competing. UET needs to allege facts, other than market share and the availability of consolidated billing, that, if proved, support a finding there is a dangerous probability PG&E's attempt to monopolize will succeed. Lastly, UET does not plead adequately antitrust injury. UET must show its loss stems from an anticompetitive aspect of PG&E's behavior, and an act is anticompetitive "only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels." *Rebel Oil*, 51 F.3d at 1433. UET's allegation that the schemes caused consumer gas prices to rise not only is highly attenuated, but also is not corroborated sufficiently by the facts contained in the complaint. In sum, PG&E's motion to dismiss this claim will be granted, but with leave to amend.

### C. Conversion

To sustain a claim for conversion, UET must demonstrate (1) UET's ownership or right to possession of the property; (2) PG&E's conversion by a wrongful act or disposition of property rights; and (3) damages. *Burlesci v. Petersen*, 68 Cal. App. 4th 1062 (1998).

UET alleges it owns the money its customers pay for its natural gas, and PG&E is wrongfully holding payments in the amount of "approximately $2.3 million." Compl. ¶ 153. The damages UET invokes include lost revenues and income, lost customers and market share, out of pocket costs associated with trying to collect customer accounts, and costs associated with trying to repair customer relationships.

PG&E insists the conversion claim fails on two independent bases. First, the complaint does not allege a specific amount of money converted by PG&E. Second, UET does not establish it was entitled to immediate possession of the property during the time of the alleged conversion.

PG&E is correct that "money cannot be the subject of an action for conversion unless a specific sum capable of identification is involved." *Haigler v. Donnelly*, 18 Cal. 2d 674, 681 (1941) (internal citation omitted). The complaint accordingly is inadequate because

1  "approximately $2.3 million" is not a sufficiently "definite sum." *PCO, Inc. v Christensen, Miller,*
2  *Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 396 (2007).  Additionally,
3  UET must allege it was entitled to immediate possession at the time of conversion, yet the
4  complaint is deficient because "a mere contractual right of payment, without more, will not
5  suffice." *Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 45 (2010) (quoting *Farmers Ins.*
6  *Exch. V. Zerin*, 53 Cal. App. 4th 445, 452 (1997)).  As a consequence, PG&E's motion to dismiss
7  this count will be granted with leave to amend.

## V. CONCLUSION

PG&E's motion to dismiss is denied as to the *respondeat superior* claim, and granted with leave to amend as to the Sherman Act and conversion claims.  Should UET elect to amend its pleading, any amended complaint must be filed within thirty (30) days from the date of this order.

**IT IS SO ORDERED**.

Dated: April 13, 2016

_____
RICHARD SEEBORG
United States District Judge

CASE NO. 15-cv-02383-RS